KENTUCKY RIVER ENTERPRISES, INC., Appellant,

v.

Jerry Otis ELKINS; Hon. Lloyd R. Edens, Administrative Law Judge; and Workers' Compensation Board, Appellees.

No. 2002–SC–0622–WC.

Supreme Court of Kentucky.

June 12, 2003.

W. Barry Lewis, Lewis and Lewis Law Offices, Hazard, Counsel for Appellant.

Gene Smallwood, Jr., Polly & Smallwood, Whitesburg, Counsel for Appellee.

**OPINION OF THE COURT**

The workers' compensation claimant whose application is the subject of this appeal did not retain the physical capacity to return to his past employment, but he did return to supervisory work for the same employer, earning the same hourly wage as at the time of his injury. An Administrative Law Judge (ALJ) awarded

triple benefits, applying the 2000 version of KRS 342.730(1)(c)1 and 2, and the Workers' Compensation Board (Board) and the Court of Appeals affirmed. Appealing, the employer maintains that the award of triple benefits was based upon an incorrect interpretation of the law, that there was no substantial evidence of a work-related accident and injury, and that the finding of a 9.5% AMA impairment was erroneous. We reverse with regard to the first issue and remand for further proceedings but affirm in all other respects.

The claimant was born in 1956. He completed high school, had an associate degree from Southeast Community College, completed one semester at Morehead State University, and had a commercial driver's license. At the time of his injury, he was working more than 60 hours per week as a mechanic and heavy equipment operator, earning $17.00 per hour, and working sufficient hours to earn an average weekly wage of $1,086.81. He testified that he had been a truck driver for 14 years, 12 of which were spent driving a coal truck. On September 8, 2000, while carrying a five-gallon can of oil to a truck in which he was changing the oil, he felt pain in his lower back and a tingling sensation in his leg. He testified that, although he completed the shift, the individual with whom he was working did any necessary lifting.

The claimant testified that he reported the incident to his supervisor on the day that it occurred, which was a Friday. On the following Sunday, he informed his employer that he could not return to work due to his injury. After recovering from back surgery, he returned to work on December 6, 2000, in a supervisory capacity. The parties stipulated that he received the same "wages" that he earned on the date of injury. At the hearing, the claimant testified that he continued to earn $17.00

per hour but worked for only 40 to 60 hours per week.

Mr. Benny Bentley was the co-worker who was helping the claimant at the time of the injury. He corroborated the claimant's version of the events of September 8, 2000. Bentley also testified that the claimant did no lifting in his supervisory job.

On September 11, 2000, the claimant sought treatment from Dr. Tidal for low back pain that had recently become worse and radiated into his left leg. Dr. Tidal noted no particular injury but did note that the claimant had a longstanding history of such pain and had undergone back surgery in 1990.[1] He had been doing well since the surgery, however, and had been able to work up until the present injury.

The claimant was referred to Dr. Sharma, an orthopaedic surgeon, whom he first saw on September 14, 2000. Dr. Sharma's notes indicated that the claimant had experienced low back pain that radiated into the left leg for about five weeks but denied any recent injury. The notes from September 26, 2000, indicate that MRI revealed a "very big" disc herniation at L5–S1, that surgery was required, that the proposed surgery would be pre-certified with the workers' compensation carrier, and that surgery would be scheduled thereafter. Subsequently, Dr. Sharma performed a laminotomy and discectomy. His notes from November 7, 2000, indicated that the September 14, 2000, dictation of the claimant's history should be corrected to indicate that the pain had begun five days rather than five weeks earlier. When questioned about the discrepancy, Dr. Sharma testified that it could have been due to an error in the dictation process and that it was not unusual to have to correct a dictated history. Furthermore, he did not think that the claimant could

have worked more than 60 hours per week up until September 14, 2000, had the injury occurred five weeks earlier. He also testified that the claimant's failure to mention a specific incident during the initial visit is a common occurrence with patients who are in acute pain.

Dr. Sharma assigned various work restrictions and stated that the claimant's impairment as a result of the L5–S1 disc was 10% under the DRE model of the AMA *Guides to the Evaluation of Permanent Impairment* (*Guides*). He acknowledged that the Fourth Edition of the *Guides* (Section 3.3F, paragraph 9) indicates that a pre-existing impairment to the same anatomic system should be subtracted from the current impairment to determine the additional impairment that the most recent injury caused. He noted, however, that the previous back surgery had involved the L4–5 level and pressure on a different nerve root and that the *Guides* did not specify that subtraction was appropriate in such an instance. He also noted that the claimant might have improved after the 1990 surgery to the point that he had no impairment, a phenomenon that he had observed in other patients. Thus, he was not certain that the *Guides* required subtraction under the circumstances.

Dr. Templin, a specialist in pain management and occupational medicine, examined the claimant on January 23, 2001. In his opinion, the claimant injured his back in the September 8, 2000, incident and sustained a 10% impairment under the DRE model as a result. Furthermore, he imposed extensive work restrictions. Addressing the question of pre-existing impairment, he noted the presence of scar tissue from the 1990 surgery and some

---

1. A claim for alleged injuries of April 6 and June 5, 1989, was dismissed in 1991 on the ground that the claimant failed to prove notice and work-relatedness.

degenerative changes, the arousal of which he thought contributed to the claimant's present condition. Thus, he attributed a 0.5% impairment to the pre-existing condition and a 9.5% impairment to the 2000 incident, explaining that 5% of the claimant's left leg radiculopathy existed before the 2000 injury and that 95% was due to the injury.

Dr. Sheridan examined the claimant on February 20, 2001, and assigned a 10% impairment. In his opinion, however, the L5–S1 rupture was secondary to the 1990 rupture and was pre-existing and active before September 8, 2000. Likewise, after conducting a review of the records, Dr. Ensalada determined that the claimant had a 10% impairment, all of which was pre-existing and active, and he thought that the low back condition did not result from the September 8, 2000, incident.

After reviewing the lay and medical evidence, the ALJ was persuaded that the claimant suffered a work-related injury on September 8, 2000, and gave timely notice. Indicating that the claimant had returned to work as a coal truck driver and mechanic after the 1990 surgery and continued in that capacity until the injury that was presently at issue, the ALJ relied upon Dr. Templin's testimony that the most recent incident accounted for a 9.5% impairment. When multiplied by the statutory factor of 0.85, it produced a disability rating of 8.08%. Based upon the restrictions that Dr. Templin imposed and upon the claimant's testimony, the ALJ determined that the claimant lacked the physical capacity to return to the type of work that he was performing at the time of the injury and concluded that the weekly benefit must be multiplied by 3 under KRS 342.730(1)(c)1.

■ Challenging the finding that the claimant sustained the injury he alleged, the employer maintains that his injury and impairment are actually the result of inci-

dents that occurred in 1989 and were the subject of a previous claim against another employer. It complains that although a CT scan from January 6, 1990, revealed a herniated disc at L5–S1, neither Dr. Templin nor Dr. Sharma reviewed the scan. Furthermore, the ALJ also ignored the 1990 scan and relied, instead, upon an MRI that was performed in September, 2000, by Dr. Sharma and revealed a large herniated disc at L5–S1. Noting that the claimant did not report a work-related injury to the physicians from whom he first sought treatment and also that he later told Dr. Sharma his pain began five days, rather than weeks, before their first appointment, the employer maintains that the ALJ relied upon subjective medical opinion rather than objective medical findings when determining that a work-related injury occurred on September 8, 2000.

In *Staples, Inc. v. Konvelski*, Ky., 56 S.W.3d 412 (2001), we determined that where medical records included notes concerning the symptoms of which the injured worker complained but also contained direct observations by the physicians and information gleaned from the tests they performed, the resulting diagnosis of a harmful change was supported by "objective medical findings." We also determined that although KRS 342.0011(1) requires proof of a harmful change to be in the form of objective medical findings, it imposes no such requirement with regard to causation.

Contrary to the employer's assertion, when deposed in the prior claim, Dr. Kennedy testified to an L4 herniation but mentioned no herniation at L5–S1. A report of a CT scan that was attached to his deposition noted a very mild herniation at L5 but indicated that it was of no clinical significance. Concern was focused on a very large herniation at L4–5 that Dr. Kennedy thought might well involve the L5–S1

nerve roots. In his opinion, the L4–5 herniation was the cause of the claimant's problems at that time. Thus, although the claimant's symptoms were similar in 1990 and 2000, the symptoms that were present in 1990 resolved after surgery and did not reoccur until after the 2000 incident, at which point an MRI revealed the presence of a large herniation at L5–S1.

Although the employer is displeased with the ALJ's reliance upon Drs. Templin and Sharma, the fact remains that their testimony concerning the work-related harmful change complied with the requirements of KRS 342.0011(1). Furthermore, unrebutted testimony from the claimant and Mr. Bartley established the circumstances of the injury. The ALJ is the finder of fact in workers' compensation claims and has the authority to decide whom to believe. Having reviewed the evidence and the arguments of the parties, we are persuaded that the ALJ's finding was reasonable and that it may not be disturbed on appeal. *Special Fund v. Francis*, Ky., 708 S.W.2d 641, 643 (1986).

■ In other arguments, the employer maintains that the ALJ awarded income benefits for an impairment that was not based on the AMA *Guides* and failed to exclude pre-existing impairment. It concludes, therefore, that the claimant is not entitled to income benefits because his present impairment is no higher than it was before his injury. In support of the argument, the employer points out that Dr. Kennedy assigned a 14% impairment in 1990 and that Drs. Sheridan and Ensalada both testified that the claimant's present impairment was 10%, all of which was pre-existing. It also maintains that the *Guides* provide for DRE impairments that are in 5% multiples and, therefore, that impairments of .5% and 9.5% are not based on the *Guides*. Finally, it maintains that the *Guides* provide that a pre-existing impairment that is verified should be subtracted from the current impairment, that Dr. Templin erred by failing to do so and, therefore, that the ALJ erred by relying upon Dr. Templin.

■ This argument relies upon certain statements from the Fourth Edition of the *Guides*, which was published in 1993, after Dr. Kennedy assigned the 14% impairment. Furthermore, the proper interpretation of the *Guides* and the proper assessment of an impairment rating are medical questions. Although Drs. Sheridan and Ensalada were of the opinion that the claimant had a 10% impairment before the alleged injury, Dr. Sharma emphasized that the present injury was to a different level of the spine and involved different nerve roots than the injury for which the claimant underwent surgery in 1990. Furthermore, he testified that the claimant might well have recovered from the 1990 injury and had no actual impairment immediately before it occurred. Dr. Templin assigned a present AMA impairment of 10%. Of that amount, he characterized a .5% impairment as pre-existing, and no medical testimony established that the method by which he did so was erroneous under the circumstances. For that reason, we are not persuaded that it was unreasonable for the ALJ to exclude only a .5% impairment when calculating the claimant's income benefit.

■ As amended effective July 14, 2000, KRS 342.730(1)(c) provides, in pertinent part, as follows:

1. If, due to an injury, an employee does not retain the physical capacity to return to the type of work that the employee performed at the time of injury, the benefit for permanent partial disability shall be multiplied by three (3) times the amount otherwise determined under paragraph (b) of this subsection,

but this provision shall not be construed so as to extend the duration of payments; or

2. If an employee returns to work at a weekly wage equal to or greater than the average weekly wage at the time of injury, the weekly benefit for permanent partial disability shall be determined under paragraph (b) of this subsection for each week during which that employment is sustained. During any period of cessation of that employment, temporary or permanent, for any reason, with or without cause, payment of weekly benefits for permanent partial disability during the period of cessation shall be two (2) times the amount otherwise payable under paragraph (b) of this subsection. This provision shall not be construed so as to extend the duration of payments.

In *Fawbush v. Gwinn*, Ky., 103 S.W.3d 5 (2003), we determined that where the evidence in a post-July 14, 2000, claim would support applying both KRS 342.730(1)(c)1 and 2, the ALJ is authorized to determine which provision is more appropriate on the facts and to calculate the benefit under that provision. We explained that the application of paragraph (c)1 is appropriate if the evidence indicates that the worker is unlikely to be able to continue earning a wage that equals or exceeds the wage at the time of the injury for the indefinite future. There, the evidence and the ALJ's findings supported the decision to apply paragraph (c)1.

Here, the ALJ determined only that the claimant could not return to the type of work that he was performing at the time of his injury and, on that basis, concluded that his weekly benefit must be multiplied by 3 under KRS 342.730(1)(c)1. For that reason, the claim must be remanded for further consideration. The parties stipulated that the claimant's average weekly wage at the time of his injury was $1,086.81 and that he earned the same "wages" since he earned the same $17.00 hourly wage when his claim was heard as he did when he was injured. What remains to be decided, however, is whether he is able to work at least the same number of hours as before the injury and, therefore, to earn an average weekly wage that equals or exceeds his average weekly wage at the time of his injury. *See Whittaker v. Robinson*, Ky., 981 S.W.2d 118 (1998). If he is, the ALJ must then apply the standard that was set forth in *Fawbush v. Gwinn*, *supra*, to determine from the evidence whether he is likely to be able to continue earning such a wage for the indefinite future and whether the application of paragraph (c)1 or 2 is more appropriate on the facts.

The decision of the Court of Appeals is hereby affirmed in part and reversed in part, and the claim is remanded to the ALJ for further proceedings.

LAMBERT, C.J., and GRAVES, JOHNSTONE, KELLER, STUMBO and WINTERSHEIMER, JJ., concur.

COOPER, J., dissents with respect to the majority's interpretation of KRS 342.730(1)(c) for the same reasons expressed in his dissenting opinion in Fawbush v. Gwinn, Ky., 103 S.W.3d 5 (2003), and would award benefits only in accordance with KRS 342.730(1)(c)(2).